UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | | |
|---|---|---|
| BERNARD FIDEL, et al., On Behalf of Themselves and All Others Similarly Situated, | ) ) ) | Lead Case No. C-1-00-320 (Consolidated with No. C-1-00-349) |
| Plaintiffs, | ) ) | Judge Herman J. Weber |
| vs. | ) ) | CLASS ACTION |
| AK STEEL HOLDING CORPORATION, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

DECLARATION OF HELEN J. HODGES IN SUPPORT OF THE PROPOSED
SETTLEMENT, PLAN OF ALLOCATION AND APPLICATION OF PLAINTIFFS'
COUNSEL FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF
EXPENSES

STRAUSS & TROY
RICHARD S. WAYNE (0022390)
WILLIAM K. FLYNN (0029536)
Federal Reserve Building
150 East Fourth Street
Cincinnati, OH 45202-4018
Telephone: 513/621-2120

Liaison Counsel

LERACH COUGHLIN STOIA
  & ROBBINS LLP
WILLIAM S. LERACH
HELEN J. HODGES
EDWARD P. DIETRICH
JEFFREY D. LIGHT
SCOTT H. SAHAM
TRICIA L. McCORMICK
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058

Lead Counsel for Plaintiffs

# TABLE OF AUTHORITIES

Page

I.    INTRODUCTION ...........................................................................................1

II.   SUMMARY OF PLAINTIFFS' ALLEGATIONS .....................................................4

III.  THE LITIGATION ..........................................................................................6

      A.    Commencement and Consolidation of the Litigation ...............................6

      B.    Motion to Dismiss..................................................................................7

      C.    Class Certification and Class Discovery...................................................8

      D.    Informal Investigation..........................................................................10

      E.    Discovery .............................................................................................11

            1.    Document Requests and Interrogatories to Defendants............................11

            2.    Third Party Discovery.........................................................................12

IV.   SETTLEMENT DISCUSSIONS .....................................................................13

V.    FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT .........................14

      A.    The Complexity, Expense and Likely Duration of the Litigation ..........15

      B.    The Reaction of the Class to the Settlement .........................................16

      C.    The Stage of the Proceedings and the Amount of Discovery Completed..............16

      D.    Plaintiffs Faced Significant Risks in Establishing Liability and Damages
            and Ultimately Succeeding at Trial.......................................................17

      E.    The Judgment of Experienced Counsel .................................................19

      F.    Public Interest ......................................................................................19

VI.   THE PLAN OF ALLOCATION .....................................................................20

VII.  COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS
      REASONABLE AND SHOULD BE APPROVED ...............................................21

      A.    The Fee Requested ...............................................................................21

      B.    Factors to Be Considered in Support of the Requested Attorneys' Fee
            Award..................................................................................................22

    1.    The Organization of Plaintiffs' Counsel and the Methods of Prosecution Used by Them ..................................................................22

    2.    The Results Obtained from Counsel's Efforts, and the Quality of the Work Performed ...................................................................................23

    3.    The Risks Undertaken by Counsel in Pursuing This Case ........................23

    4.    Risks of Contingent Litigation ..................................................................24

    5.    Standing and Expertise of Plaintiffs' Counsel ..........................................27

    6.    Standing and Caliber of Defendants' Counsel ..........................................28

C.    Plaintiffs' Counsel Should be Reimbursed for the Expenses They Have Incurred ...............................................................................................................28

VIII.    CONCLUSION ...............................................................................................................29

I, HELEN J. HODGES, declare:

1.      I am a member of the law firm of Lerach Coughlin Stoia & Robbins LLP, Lead Counsel for plaintiffs in this Litigation. I have personal knowledge of the matters set forth in this declaration, and if called to testify, could and would competently testify thereto.

## I.    INTRODUCTION

2.      I submit this declaration in support of plaintiffs' application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for (a) final approval of settlement of this action; (b) final approval of the Plan of Allocation of settlement proceeds; and (c) an award of attorneys' fees and reimbursement of expenses. The Stipulation of Settlement dated as of March 26, 2004 (the "Stipulation"), provides for payment of $4,000,000 which has been deposited in escrow and is earning interest for the benefit of the Class (the "Settlement Fund"). The settlement resolves all claims asserted by plaintiffs and the Class in this action against Defendants, AK Steel Holding Corporation ("AKS" or the "Company"), Armco Inc. ("Armco"), AKS's CEO and Chairman of the Board Richard M. Wardrop, Jr., Armco's CEO and Chairman of the Board James F. Will, AKS's president James L. Wareham, AKS's Senior Vice President, Treasurer and CFO James L. Wainscott, AKS's Executive Vice President and General Counsel John G. Hritz, and AKS directors Allen Born, Bonnie G. Hill, Robert H. Jenkins, Lawrence A. Leser, Robert E. Northam, Cyrus Tang and James A. Thomson (collectively the "Defendants").

3.      This declaration sets forth the nature of the claims asserted, the principal proceedings to date, the legal services provided by plaintiffs' counsel, the settlement negotiations, and also demonstrates why the settlement and Plan of Allocation are fair and in the best interests of the Class, and why the application for attorneys' fees and expenses is reasonable and should be approved by the Court.

4.    Lead Counsel has devoted considerable time, energy, effort and resources for the benefit of class members. The settlement was reached only after plaintiffs' counsel: (a) conducted an extensive factual investigation; (b) interviewed numerous witnesses; (c) reviewed and analyzed AKS's and Armco's publicly filed documents, financial reports and analysts' reports; (d) reviewed and analyzed voluminous media files concerning AKS and Armco, including all press releases and public statements issued by the Companies; (e) filed detailed and comprehensive complaints; (f) served document requests and interrogatories; (g) reviewed and analyzed approximately 25 boxes of documents produced by defendants and nineteen third parties; (j) moved for class certification; (k) prevailed on defendants' motion to dismiss; (l) assessed the likelihood of prevailing on any motion for summary judgment and at trial; (m) analyzed the damages likely to be proven at trial; (n) consulted with experts in loss causation, materiality and damages to quantify the damages suffered; and (o) successfully negotiated at arm's length a favorable settlement for the Class.

5.    In sum, this settlement is the product of time-consuming, intensive investigation, aggressive litigation and extensive arm's-length negotiations. It was negotiated on both sides by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses and takes into account the significant risks specific to this case if litigation were to continue. The settlement confers an immediate benefit on the Class and eliminates the numerous risks and obstacles of continued litigation, the outcome of which was uncertain. It is respectfully submitted that under these circumstances the settlement should be approved as fair, reasonable and adequate.

6.    In addition, the Class Members appear to overwhelmingly approve of the settlement and Plan of Allocation as well as the reasonableness of the attorneys' fees and expenses requested. Pursuant to the Court's Order Preliminarily Approving Settlement and Providing for Notice dated March 31, 2004 (the "Notice Order"), a Notice of Settlement of Class Action (the "Notice") was

- 2 -

mailed to 31,971 potential Settlement Class Members. Thereafter, on May 24, 2004, a summary notice was published in the national edition of Investor's Business Daily. These notices apprized class members of the terms of the settlement, and of their right to object to the settlement, to the Plan of Allocation or to plaintiffs' counsel's application for attorneys' fees and reimbursement of expenses. The time to file objections to the proposed settlement expired on June 28, 2004. To date, no objections have been filed. We respectfully submit that this is strong validation of the Settlement, the Plan of Allocation and the reasonableness of the fee and expense request.

7.     This Declaration also addresses the proposed Plan of Allocation of settlement proceeds. The Plan of Allocation is set forth fully in the Notice and was developed in consultation with plaintiffs' damages experts and represents a fair straightforward way to distribute the settlement proceeds and therefore is fair, reasonable and adequate and should be approved.

8.     This Declaration is also submitted in support of the application by plaintiffs' counsel for an award of attorneys' fees in the amount of 25% of the Settlement Fund and reimbursement of expenses in the amount of $250,040.65 that were reasonably and necessarily incurred in prosecuting this action (or 31.25% of the Settlement Fund, including expenses), plus interest. Plaintiffs' counsel committed significant resources to the litigation, notwithstanding the significant uncertainty as to whether the litigation would succeed. As discussed below, the requested fee falls well within the parameters that are recognized as appropriate in class actions in this Circuit and in courts across the country and is justified in light of the benefits conferred upon the class, the risks undertaken, the quality of representation, and the risks of continued litigation.

9.     Legal support for approval of the settlement, the Plan of Allocation and the fee and expense request, in light of the factors addressed herein, is set forth at greater length in the accompanying Memorandum in Support of the Proposed Settlement, Plan of Allocation and Application of Plaintiffs' Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses.

## II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS

10.    This is a securities class action in which plaintiffs alleged that defendants violated §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b), n(a) and t(a)) and §§11 and 15 of the Securities Act of 1933 ("Securities Act") (15 U.S.C. §§77k and o) by making false and misleading statements about AKS's business and by issuing false and misleading financial statements and results between July 15, 1999 and January 25, 2000 (the "Class Period"). The operative complaint is the Consolidated Amended Complaint for Violation of the Federal Securities Laws (the "Complaint") filed August 28, 2000.

11.    AKS, through its wholly owned subsidiary AK Steel Corporation, is a fully integrated producer of flat-rolled carbon steel. The Complaint alleges that in February 1998, although AKS had a "super patent" for aluminum and coatings on stainless steel, it could not easily access the stainless steel it needed. AKS could not obtain stainless steel domestically and pressure on Congress was mounting to impose tariffs on imported stainless steel. Thus, the Complaint alleges that AKS tried for over a year to acquire Armco because Armco could provide AKS with a steady supply of stainless steel which the Company could then sell profitably. In May 1999 the two companies entered into a definitive merger agreement.

12.    The Complaint alleges that Defendants knew that material negative problems had arisen with regard to AKS's business which would likely interfere with its ability to successfully merge with Armco. For instance, the Complaint alleges that Defendants knew that an expected rise in raw material costs would soon negatively impact AKS because the Company would have to pay more for its materials, but could not, in turn, pass the price increase on to its customers because AKS had long-term contracts with most of its customers which prevented price increases until the contracts expired. In addition, Defendants were aware that there were serious labor issues affecting Armco and AKS manufacturing plants.

- 4 -

13.    The Complaint alleges that the Defendants, notwithstanding this knowledge, embarked on a scheme to portray the Company as successful and growing in order to, among other things, artificially inflate the price of AKS stock to ensure the completion of the merger with Armco on favorable terms and to ensure their hefty year-end incentive bonuses. On July 15, 1999, the Company issued a press release reporting "record" revenues for 2Q99. Defendants, however, knew that AKS was only able to report the "record" earnings because the Company had been double-shipping products to its customers, including Walker (a subsidiary of Tenneco) and Arvin.

14.    On August 25, 1999, AKS and Armco filed a Joint Proxy which touted the merger as being in the best interests of both Armco and AKS stockholders. The Complaint alleges that the Joint Proxy failed to disclose the material negative problems going on inside AKS, including the labor problems in Mansfield. The Complaint further alleges that in September 1999, AKS management engaged in a risky strategy to break the union at the Mansfield plant and lock-out the workers. When the workers rejected the agreement, AKS locked-out the workers forcing a labor dispute. To keep the appearance of success, however, AKS management concealed the extent of the labor problems at Mansfield.

15.    The merger between AKS and Armco was completed on September 30, 1999. The Complaint alleges that despite the completion of the merger, however, AKS management still could not disclose the truth to the market because AKS needed to convince note holders of Armco's long-term debt not to exercise their option of requiring AKS to repurchase the notes. If the note holders exercised their options, AKS would have to expend millions in much needed capital. Therefore, the Complaint alleges that Defendants continued to disseminate positive statements about AKS to the public and offered cash payments to holders of the notes who agreed to waive their repurchase options. Meanwhile, AKS continued to conceal the negative truth about its business, including the

seriousness of the labor issues at its Mansfield plant. AKS's concealment plan worked and AKS had to repurchase only $74 million of the $225 million in notes.

16.    On January 25, 2000, AKS could conceal the truth no longer. After the close of trading, AKS shocked the market by reporting that operating costs in 2000 would be significantly higher than in 1999 due to the escalating prices of raw materials and to the expenses relating to the strike at Mansfield. Upon these surprising disclosures, analysts cut their 2000 forecasts for AKS, and AKS stock plummeted to a low of $11-1/2 on huge volume.

## III.    THE LITIGATION

### A.    Commencement and Consolidation of the Litigation

17.    On and after April 19, 2000, the following actions were filed as proposed class actions on behalf of certain persons who had purchased or otherwise acquired the common stock of AKS:

(a)    *Fidel v. AK Steel Holding Corp., et al.*, Civil Action No. 1-00-320; and

(b)    *Shams v. AK Steel Holding Corp., et al.*, Civil Action No. 1-00-349.

18.    On June 19, 2000, Bernard Fidel and Ironwood Capital Management moved for appointment as Lead Plaintiffs. On July 28, 2000, the Court appointed Bernard Fidel and Ironwood Capital Management as Lead Plaintiffs and Milberg Weiss Bershad Hynes & Lerach LLP lead counsel.

19.    Plaintiffs filed the Complaint on August 28, 2000. The Complaint asserts claims against Defendants under §§10(b), 14(a) and 20(a) of the Securities Exchange Act and §§11 and 15 of the Securities Act. Plaintiffs alleged that Defendants made false and misleading statements regarding AKS's revenues, labor problems and the effect of raw material price increases on the Company's bottom line. Plaintiffs further alleged that Defendants' actions were taken for the purpose of inflating the Company's stock price which was used to acquire Armco shares at a more favorable exchange ratio.

**B.    Motion to Dismiss**

20.    On October 20, 2000, all Defendants except James F. Will filed a motion to dismiss the Complaint. Defendant James F. Will filed a separate motion to dismiss the motion and supporting memorandum. Defendants argued that plaintiffs' allegations were insufficient to state a claim under the federal securities laws and that many of the misleading statements fell within the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). More specifically, Defendants argued that plaintiffs' allegations regarding AKS's problems with the United Steel Workers at Armco's Mansfield Ohio facility "lack[] even a shred of the particularity required by Fed. R. Civ. P. 9(b) and the PSLRA." Defts.' Mot. at 6. Defendants further argued that the SEC filings and analyst reports cited in the Complaint reveal that Defendants repeatedly disclosed both the potential for labor problems at Mansfield and the possible impact on the Company's business. Defendants further argued that they did not commit a material omission by failing to disclose that raw material price increases could negatively affect AKS's business as this information was both basic and fully disclosed to the market. Defendants also argued that the plaintiffs failed to adequately plead that Defendants were aware of the adverse factors addressed in the Complaint at the time the allegedly false statements were made.

21.    The motion practice with respect to defendants' motion to dismiss required detailed and extensive opposition research and briefing. On December 29, 2000 plaintiffs filed their Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint and a motion to strike certain exhibits attached to the Defendants' motion to dismiss. Thereafter, Defendants filed their reply brief in further support of their motion to dismiss. On February 16, 2001, plaintiffs filed a reply memorandum in support of their motion to strike.

22.   The Court held oral argument and on September 19, 2002, the Court entered an order denying Defendants' motion to dismiss with respect to plaintiffs claims relating to AKS's double shipping of steel, the Mansfield labor situation, and raw material price increases. The Court granted Defendants' motion with respect to statements regarding earnings projections for AK Steel. With respect to plaintiffs' allegations relating to the Mansfield labor situation, the Court stated:

> Accordingly, here, unlike their earnings projections allegations, Plaintiffs have articulated some reason to believe that exploring such allegations further "could lead to the discovery of admissable evidence" to support their claims.

*See* Order at p.28. With respect to the rising raw material costs increases the Court stated:

> As a question of fact is implicated by the inquiry into whether Defendants accurately conveyed that rising raw material costs could hurt rather than help AK Steel, Defendants' motion to dismiss for lack of a material omission must be denied as to this issue.

Order at 31. As to the double shipping of finished product to customers in order to manipulate sales figures, the Court found that "[t]he details thus pled are sufficient to warrant discovery as to that issue." Order at 21 n.5.

23.   On October 16, 2002, Defendants filed answers to the Complaint, denying all liability.

**C.    Class Certification and Class Discovery**

24.   On November 4, 2002, plaintiffs filed a motion for class certification asserting that all elements of Federal Rule of Civil Procedure 23(a) and (b)(3) had been satisfied.

25.   Defendants then requested that plaintiffs agree to a modified briefing schedule to allow Defendants time to take depositions of the proposed class representatives prior to filing their opposition brief. After considerable negotiations, the parties agreed to an extended briefing schedule.

26.   Defendants served a notice of deposition and request for documents on both of the proposed class representatives on December 9, 2002. Plaintiffs' counsel worked with their clients to

discuss the requests and assert the appropriate objections and responses. Plaintiffs served responses and objections to the outstanding discovery on January 8, 2003.

27.    Starting on January 15, 2003 plaintiffs produced numerous documents responsive to Defendants' class certification document requests.

28.    On February 19, 2003 Dr. Fidel was deposed by defense counsel. On March 18, 2003, after additional documents were produced, Dr. Fidel again sat for deposition. Prior to each deposition, plaintiffs' counsel met with Dr. Fidel to discuss the issues involved.

29.    On February 20, 2003, Ironwood Capital Management withdrew from the Litigation.

30.    On May 5, 2003, Defendants filed their opposition to plaintiffs' motion for class certification arguing that: (a) Dr. Fidel was an inadequate class representative because he lacked sufficient knowledge of the litigation; (b) Dr. Fidel could not represent both the entire class and the subclass of investors who acquired their AKS shares in the Armco merger; (c) Dr. Fidel's post-class purchases of AKS stock rendered him an atypical class representative; (d) Dr. Fidel is a professional plaintiff; and (e) Dr. Fidel lacked credibility to serve as a class representative.

31.    After receiving Defendants' opposition, plaintiffs' counsel on June 10, 2003, addressed a letter to defense counsel, revealing the existence and willingness of William Gruenke and three other AKS shareholders to serve as class representatives.

32.    Plaintiffs filed a reply brief in support of their motion for class certification on June 19, 2003, arguing that: (a) Dr. Fidel was knowledgeable of the issues involved in this litigation and had fully participated since its inception; (b) Defendants' challenges were an impermissible attempt to adjudicate the merits of the case at the class certification stage; (c) Dr. Fidel could adequately represent all investors in the class; (d) Dr. Fidel's post class period stock acquisitions did not render him an atypical class representative; and (e) Dr. Fidel was not a professional plaintiff.

33.    The Court then held oral argument.  On September 18, 2003, the Court issued a written opinion denying plaintiffs' motion for class certification without prejudice to plaintiffs re-filing the motion with a new proposed class representative.  On October 17, 2003 plaintiffs filed a motion to intervene William Gruenke as a plaintiff in this action.  On November 19, 2003 the Court granted William Gruenke's motion to intervene as a plaintiff.  On March 26, 2004, the parties stipulated to class certification and the appointment of William Gruenke as class representative.  On March 31, 2004 the Court certified this action as a class action and appointed William Gruenke as the representative of the class.

**D.    Informal Investigation**

34.    Lead Counsel for plaintiffs engaged in a thorough investigation of the facts underlying the action in connection with preparation of the complaints and with regard to the prosecution of the litigation.  Plaintiffs' investigation included a review of AKS and Armco SEC filings, financial statements, securities analysts' reports, press releases issued by the Companies, and articles and media reports about AKS and Armco, discussions with consultants and interviews with third parties.

35.    Lead Counsel and their investigators spent a significant amount of time and effort in locating witnesses.  As a result of those efforts, plaintiffs' counsel interviewed former AKS employees and third parties with knowledge about AKS's accounting practices and business prospects. The information derived from these interviews was important and proved valuable in the preparation of the detailed complaints and other pleadings filed.  In addition, plaintiffs' counsel learned of additional avenues of inquiry to be explored with Defendants and non-party witnesses.

36.    Plaintiffs' damage consultants analyzed the potential recoverable damages and the materiality of the alleged false and misleading statements.  These consultants also assisted in formulating the Plan of Allocation in connection with the settlement, which will determine how the

settlement proceeds are distributed to class members who file valid Proof of Claim and Release forms.

37.    Plaintiffs' in-house accounting experts reviewed documents and analyzed AKS's financial statements to determine the extent to which they were allegedly false and misleading in violation of GAAP. They also assisted in formulating the allegations in the complaints. Plaintiffs' counsel held several meetings with these experts to discuss their analyses and conclusions.

### E.    Discovery

38.    After the Court denied defendants' motion to dismiss, the PSLRA discovery stay was lifted, and plaintiffs began formal discovery. Beginning on December 17, 2002, the parties exchanged initial disclosures pursuant to Federal Rule of Civil Procedure 26. Plaintiffs' disclosures included a lengthy list of witnesses who had been interviewed prior to the commencement of formal discovery. Plaintiffs served document requests and interrogatories, as set forth below.

### 1.    Document Requests and Interrogatories to Defendants

39.    On October 15, 2002, plaintiffs served document requests on Defendants seeking materials related to each of the claims at issue in this litigation.

40.    Rather than respond to plaintiffs' document requests, Defendants served extensive objections. This resulted in an arduous series of meet-and-confer discussions (which were conducted via letters and conference calls) with counsel for the Defendants.

41.    Defendants' counsel ultimately made available for plaintiffs' review approximately 17 boxes of documents beginning in early 2003. These documents were all reviewed by plaintiffs' counsel. It took several months to review and analyze these voluminous materials. After the documents were reviewed by counsel, they were duplicated and organized by both witness and relevant issues.

42.    On January 10, 2003, plaintiffs served interrogatories on Defendants, as set forth below:

| INTERROGATORY | DATE |
|---|---|
| First Set of Interrogatories to AKS defendants | January 10, 2003 |
| First Set of Interrogatories to James F. Will | January 10, 2003 |

### 2.    Third Party Discovery

43.    Starting on January 10, 2003, plaintiffs served document subpoenas on the following third parties, as set forth below:

| THIRD PARTY | DATE |
|---|---|
| Walker Manufacturing | January 10, 2003 |
| Arvin Industries | January 10, 2003 |
| Deloitte & Touche | January 10, 2003 |
| Precision Strip | January 10, 2003 |
| Bear Stearns | January 10, 2003 |
| Lehman Brothers | January 10, 2003 |
| Salomon Smith Barney | January 10, 2003 |
| Credit Suisse First Boston | January 10, 2003 |
| Morgan Stanley Dean Witter | January 10, 2003 |
| Donaldson Lufkin & Jenrette | January 10, 2003 |
| Jagnotes.com, Inc. | January 10, 2003 |
| J.P. Morgan | January 10, 2003 |
| Thomas Abrams | January 10, 2003 |
| Richard Aldrich | January 10, 2003 |
| Waldo Best | January 10, 2003 |
| Dan Dorfman | January 10, 2003 |
| Michael F. Gambradella | January 10, 2003 |

Southwestern Ohio Steel LP                    June 11, 2003

Electrolux Home Products                      September 10, 2003

44.     After numerous meet and confer conferences with each of the above third parties, plaintiffs' counsel ultimately obtained and reviewed approximately 7 boxes of documents, from the above third parties, beginning in early 2003. These documents were all reviewed and analyzed by plaintiffs' counsel. After being reviewed by counsel, the documents were duplicated and organized by both witness and relevant issue.

## IV.    SETTLEMENT DISCUSSIONS

45.     On January 9, 2003, plaintiffs issued a demand of settlement. Thereafter, the parties held settlement discussions for several months. During the ongoing negotiations, the parties expressed the strengths of their positions and weaknesses of the opposing positions.

46.     The parties were able to ultimately arrive at a settlement of the Litigation for $4,000,000 in cash.

47.     After the parties reached an agreement in principle to settle the Litigation, the parties negotiated the terms of the memorandum of understanding which set forth the basic terms of the settlement. After extensive negotiations, the parties executed the agreed-upon memorandum.

48.     Thereafter, plaintiffs' counsel drafted the Stipulation and its Exhibits, such as the notice to be mailed to class members, the Proof of the Claim and Release form and the form of final judgment and sent them to counsel for Defendants. After the initial draft was sent, there were negotiations with Defendants' counsel concerning the release language and other details. As a result, additional drafts and redrafts of these papers were exchanged before the Stipulation was executed.

49.     Plaintiffs' counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. Our experience in the field allowed us to identify the

complex issues involved in this case and to formulate strategies to effectively prosecute a case of this complexity. We believe that our reputations as attorneys who are unafraid to zealously carry a meritorious case through the trial and appellate levels gave us a strong position in engaging in settlement negotiations with Defendants, even under the difficult and challenging circumstances present here.

50.    On March 26, 2004, plaintiffs filed a motion for preliminary approval of the settlement. On March 31, 2004, the Court preliminarily approved the terms of the settlement and directed that Lead Counsel cause the mailing of the Notice and the Proof of Claim and Release (the "Proof of Claim") to all potential Settlement Class Members identifiable with reasonable effort.

51.    The Court's Notice Order also directed plaintiffs' counsel to cause the Summary Notice for publication ("Publication Notice") to be published in *Investor's Business Daily*.

52.    The Declaration of Carole K. Sylvester of Gilardi & Co. LLC, the court-appointed Claims Administrator, which was previously filed with the Court, attests that a total of 31,971 Notices were mailed to potential class members and that the Summary Notice was published on May 4, 2004, as directed by the Court.

53.    The Notice provides that any objections to the settlement, the Plan of Allocation or the application for attorneys' fees and reimbursement of expenses were to have been filed by June 28, 2004. That date has now passed, and to the knowledge of plaintiffs' counsel, no objection has been filed to the settlement, the Plan of Allocation of settlement proceeds or to plaintiffs' counsel's application for attorneys' fees and reimbursement of expenses.

## V.    FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

54.    The Stipulation is the result of arm's-length negotiations between experienced counsel who have concluded that the settlement is fair, reasonable and adequate and should be

approved by the Court. Settlement at this time avoids the risk of long and costly uncertain additional litigation.

55.    The pertinent criteria for evaluating the fairness of a proposed class action settlement in this Circuit include the following factors: the complexity, expense and likely duration of the litigation; the reaction of the class to the settlement; the stage of the proceedings and the amount of discovery completed; the risks of establishing liability; the likelihood of ultimate success on the merits balanced against the amount and form of relief offered in the settlement; the judgment of experienced trial counsel; the nature of the negotiations, the objections raised by class members; and the public interest. Based on an analysis of these factors, it is clear that the settlement before the Court is fair, reasonable and adequate and should be approved pursuant to Rule 23 of the Federal Rules of Civil Procedure.

### A.    The Complexity, Expense and Likely Duration of the Litigation

56.    In assessing the merits of the settlement, plaintiffs' counsel considered the likelihood of success at trial and the wide-ranging factual and legal questions which would have been vigorously disputed in this Litigation. Plaintiffs' counsel were aware that many of the defenses which would have been asserted by the Defendants would have had some possibility, although uncertain, of success. This uncertainty made the outcome of the case problematic, especially when weighed against the tangible benefits conferred by the settlement.

57.    A substantial amount of work remained to proceed toward a trial of this case. Continued discovery in this case would have been complex and time-consuming. Experts would also have to be designated and expert discovery conducted. Defendants' expected motion for summary judgment would have to be briefed and argued, a pretrial order would have to be prepared, proposed jury instructions would have to be submitted and motions in limine would have to be filed and argued. Whatever the outcome of trial, appeals could be taken to the Court of Appeals for the

Sixth Circuit and perhaps even to the United States Supreme Court. All of the foregoing would have extended the case and delayed the ability of the Settlement Class to recover for many years.

**B.      The Reaction of the Class to the Settlement**

58.      Notice of this proposed settlement, in the form and manner approved by the Court, was mailed to potential settlement Class Members and published in the *Investor's Business Daily*. Settlement Class Members had until June 28, 2004 to object and/or request exclusion from the Settlement Class. It is an overwhelming endorsement of this settlement, the Plan of Allocation and the fee and expense request that *not even one* objection was received.

**C.      The Stage of the Proceedings and the Amount of Discovery Completed**

59.      As set forth herein, plaintiffs' counsel have conducted a substantial investigation into the facts and circumstances of this action, giving plaintiffs' counsel the ability to clearly evaluate the relative merits of each side's case and enabling them to enter into this settlement with a clear view of the strengths and weaknesses of plaintiffs' claims.

60.      Prior to reaching the settlement, plaintiffs' counsel conducted an investigation relating to the claims and the events and transactions underlying plaintiffs' claims and conducted pretrial discovery on the merits, including, among other things, the review of approximately 25 boxes of documents produced by defendants and nineteen third parties. Plaintiffs' counsel thoroughly analyzed all of the evidence obtained during pretrial discovery and applied it to the law relating to the claims of plaintiffs and the Class against the Defendants and the potential defenses thereto.

61.      The settlement negotiations were conducted at arm's length by diligent and experienced counsel only after each side had become fully prepared to litigate this action to obtain a fair result. This Litigation clearly reached the stage where the parties had a clear view of the strengths and weaknesses of their cases.

- 16 -

62.    The terms of the settlement were fairly, honestly and aggressively negotiated by all parties. Two important factors support such a finding. First, and most importantly, this case was vigorously litigated and only settled after plaintiffs' Complaint was upheld. During the period of continued negotiations, the parties continued to litigate this action, brief class certification, and continue document discovery. During settlement negotiations Lead Counsel made it very clear that while they were prepared to fairly assess the strengths and weaknesses of the claims asserted, they would continue to litigate rather than settle for less than fair value. These facts further highlight that the parties vigorously litigated up until a settlement was finally reached. Indeed, counsel can confidently represent that the settlement was the result of an adversarial process designed to produce a fair and honest compromise.

### D.    Plaintiffs Faced Significant Risks in Establishing Liability and Damages and Ultimately Succeeding at Trial

63.    Another factor considered in assessing the merits of class action settlements is whether plaintiffs faced significant risks at the class certification stage, as well as, in establishing liability and damages. This analysis supports the conclusion that the settlement is fair, reasonable and adequate to the class.

64.    During the course of this Litigation, plaintiffs' believe that they developed significant evidence in support of their allegations. At the same time, however, they came to realize that equally significant hurdles existed such that prevailing at trial would be very difficult. Some of the major issues confronting plaintiffs were:

(a)    *Failure to allege a material misstatement* – Defendants have continually asserted that plaintiffs have not alleged a material misrepresentation or omission regarding Raw Material Costs or the Mansfield Labor situation. Although plaintiffs prevailed on this issue at the motion to dismiss stage the Court did not make any specific factual findings. There was a substantial risk that the trier of fact would find against plaintiffs on this issue. Specifically,

Defendants have continually asserted that the relevant SEC filings and analyst reports cited in the Complaint reveal that Defendants repeatedly disclosed both the problems at the Mansfield facility and the possible impact on the Company's bottom line. To prevail at trial plaintiffs would necessarily have to convince the jury that Defendants' argument in this regard lacks merit.

(b)     *PSLRA Safe Harbor* – Defendants have continually asserted that plaintiffs' claims are barred by the PSLRA Safe Harbor provision. Although plaintiffs prevailed on this issue at the motion to dismiss stage, some risk exists that the trier of fact would find against plaintiffs on this issue. To prevail at trial plaintiffs would necessarily have to convince the jury that Defendants knew of the adverse facts at the time they made the allegedly false statements. Short of obtaining an admission of liability from the key insider defendants, this proof would necessarily be in the form of circumstantial evidence which is primarily within the control of Defendants.

(c)     *Scienter* – Defendants have continually argued that plaintiffs will be unable to prove that Defendants knew that the statements at issue were false when made. Defendants would also argue that their lack of insider trading negated any inference of scienter. Although plaintiffs prevailed on this issue at the motion to dismiss stage, some risk exists that the trier of fact would find against plaintiffs on this issue. To prevail at trial plaintiffs would necessarily have to convince the jury that Defendants knew of the falsity of their statements or made them with a reckless disregard for the truth of the matter asserted. Short of obtaining an admission of liability from the key insider defendants, this proof would necessarily be in the form of circumstantial evidence which is primarily within the control of the Defendants.

(d)     *Loss causation and damages* – Defendants would likely have raised loss causation and damages as a substantial issue. As an initial matter, these issues are highly technical and are subject to expert testimony. Hence, two elements of plaintiffs' case would hinge on a "battle of the experts," the result of which could not be known.

65.    Thus, Defendants asserted that they possessed absolute defenses to the claims by plaintiffs, including those mentioned above. Although plaintiffs believe they may well have prevailed at both summary judgment and trial, there is no doubt that Defendants would have employed every imaginable argument to avoid liability had there not been a settlement. There is no question that a trial on the merits would require resolution of numerous complex issues of law and fact. A jury or tier of fact may be swayed by Defendants' arguments and find in favor of Defendants. Even if plaintiffs were to prevail at trial and are awarded damages, lengthy appeals would almost be assured due to the complex legal and factual issues raised it his action. Moreover, no one can predict in the current corporate environment whether a significant judgment that was upheld on appeal several years from now would be collectable.

### E.    The Judgment of Experienced Counsel

66.    Another factor in considering whether to approve class action settlements is the judgment of the parties that the settlement is fair and reasonable. As outlined above, the settlement was the product of continuing arm's-length negotiations between adversaries with significant experience in securities class action litigation.

67.    The settlement in this case is the product of extensive, adversarial, arm's-length negotiations conducted by experienced counsel who are fully familiar with all aspects of this litigation and class action litigation generally. Indeed, plaintiffs' counsel are fully familiar with the facts and law applicable to this litigation and are well acquainted with the prosecution of class actions, including specifically securities fraud class actions. Therefore, the settlement enjoys a presumption of fairness and reasonableness.

### F.    Public Interest

68.    The proposed settlement promotes the public interest because aggrieved class members are afforded an avenue of prompt relief at no cost for their claims. It is in the public interest to resolve all such claims globally, rather than through duplicative and individual suits which

- 19 -

would drain judicial resources while – at best – resolving only a tiny fraction of all claims. The settlement also avoids expensive uncertain litigation including eliminating the possibility of a time-consuming trial and subsequent appeals.

## VI.    THE PLAN OF ALLOCATION

69.    Pursuant to the Notice Order and as set forth in the Notice, all class members who wish to participate in the distribution of the Settlement Fund must submit a proper Proof of Claim form no later than 90 days from the Notice date. As provided in the Stipulation and the Notice, after deducting all appropriate taxes, administrative costs, attorneys' fees and reimbursement of expenses, the Settlement Fund (the "Net Settlement Fund") shall be distributed according to the proposed Plan of Allocation.

70.    If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among class members who submit appropriate Proof of Claim forms.

71.    The proposed Plan of Allocation provides that to the extent there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim, as defined below. If, however, the amount in the Net Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, then each Authorized Claimant shall be paid that percentage of the Net Settlement Fund that each Authorized Claimant's claim is of the total of the claims of all Authorized Claimants. A "claim" will be computed as follows:

1.    For shares of AK Steel Holding Corporation common stock that were *purchased or otherwise acquired between July 15, 1999 through January 25, 2000*, and

(a)    sold prior to January 26, 2000, the claim per share is the difference between the purchase price less the sales price;

- 20 -

(b)     retained at the end of January 25, 2000, the claim per share is the difference between the purchase price less $12.375 (January 26, 2000 closing price).

72.     For Class Members who held shares at the beginning of the Class Period or made multiple purchases or sales during the Class Period, the first-in, first-out ("FIFO") method will be applied to such holdings, purchases and sales for purposes of calculating a claim. Under the FIFO method, sales of shares during the Class Period will be matched, in chronological order, first against shares held at the beginning of the Class Period. The remaining sales of shares during the Class Period will then be matched, in chronological order, against shares purchased during the Class Period.

73.     A Class Member will be eligible to receive a distribution from the Net Settlement Fund only if a Class Member had a net loss, after all profits from transactions in AKS common stock during the Class Period are subtracted from all losses. However, the proceeds from sales of shares which have been matched against shares held at the beginning of the Class Period will not be used in the calculation of such net loss.

74.     This proposed Plan of Allocation was formulated with the assistance of plaintiffs' damage consultants in order to calculate a fair way to divide the Net Settlement Fund for distribution among Settlement Class Members.

## VII.     COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE AND SHOULD BE APPROVED

### A.     The Fee Requested

75.     Plaintiffs' counsel jointly request a Fee and Expense Award of $1,250,040.65 (or 31.25% of the Settlement Fund). This amount represents twenty-five percent (25%) of the Settlement Fund plus expenses incurred in the prosecution of the litigation in the amount of $250,040.65. The percentage sought is well within the range of fees awarded in similar class actions in this Circuit and in courts nationwide. As set forth in the accompanying memorandum of law, this

simple and direct method of computing fees is practical, is supported by public policy, has been recognized as appropriate by the United States Supreme Court for cases of this nature, and represents the overwhelming current trend in most circuits including the Sixth Circuit. The percentage method is also supported by the PSLRA. However, even under the lodestar method, the requested fee is amply justified. Lodestar is the arithmetic calculation of the number of hours each professional spent on a matter multiplied by that professional's hourly billing rate. The cumulative lodestar for the services performed by all of the plaintiffs' firms in this action is $886,730.50, which represents a slight multiplier of 1.12 which is below multipliers commonly awarded by district courts in the Sixth Circuit.

76.    The Notice mailed to Class Members, sets forth that plaintiffs' counsel will collectively seek an award of attorneys' fees from the Settlement Fund of 25% of the Settlement Fund and for reimbursement of their expenses up to a maximum of $290,000. Pursuant to this Court's Notice Order, all objections had to be served and filed no later than June 28, 2004. As noted above, not a single objection has been made to date. This factor is highly relevant to a determination of the reasonableness of the fee request, especially in today's environment of increased shareholder activism in securities class action litigation.

**B.    Factors to Be Considered in Support of the Requested Attorneys' Fee Award**

**1.    The Organization of Plaintiffs' Counsel and the Methods of Prosecution Used by Them**

77.    Lead Counsel, Milberg Weiss Bershad Hynes & Lerach LLP now Lerach Coughlin Stoia & Robbins LLP, are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions, and have achieved significant acclaim for their work. Our experience in the field allowed us to identify the complex issues involved in this case and to formulate strategies to effectively prosecute this case. Our reputations as attorneys unafraid to carry

a meritorious case through trial and appeal give us strong leverage in engaging in settlement negotiations with defendants.

78.    This action was prosecuted efficiently and with a minimum of duplication through Lead Counsel's direction and control of the investigation, discovery and briefing of all the issues.

### 2.    The Results Obtained from Counsel's Efforts, and the Quality of the Work Performed

79.    The settlement terms have already been described in detail herein. The settlement is a very good recovery for the Class in light of the substantial risk of no recovery if the litigation were to continue. There was no guarantee that plaintiffs would succeed in convincing the Court or a jury that the statements made by Defendants during the Class Period were false, or, if such statements were found to be false, that they were material, or if they were false and material, that they were made with scienter, or that there were substantial damages. Indeed, Defendants have adamantly denied liability and are represented by experienced and very capable defense counsel.

80.    The quality of the work performed is reflected by the fact that counsel were able to obtain a favorable result for the Class in a situation where the result after subsequent litigation might well have been a total loss for the Class.

81.    Settlement at this juncture represents the responsible determination by plaintiffs' counsel to secure value for the Class *now*, in light of all the attendant risks and obstacles of obtaining a large settlement or judgment in the future. The decision to settle this Litigation at this stage represents a very good result for the Class and is unquestionably fair, reasonable and adequate.

### 3.    The Risks Undertaken by Counsel in Pursuing This Case

82.    This Litigation was undertaken by plaintiffs' counsel on a wholly contingent basis. From the outset, plaintiffs' counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the investment of time and money the case would require. In undertaking that responsibility, plaintiffs' counsel were obligated

- 23 -

to assure that sufficient attorney resources were dedicated to the prosecution of this Litigation and that funds were available to compensate staff and to pay for the considerable out-of-pocket expenses which a case such as this entails.

83.     Because of the nature of a contingent practice where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also have to advance the expenses of the litigation. With an average lag time of three to four years for these cases to conclude, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis.

84.     The above does not even take into consideration the possibility of no recovery. It is wrong to assume that a law firm handling complex contingent litigation always wins. Tens of thousands of hours have been expended in losing efforts. The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

### 4.     Risks of Contingent Litigation

85.     There are numerous cases where plaintiffs' counsel in contingent cases such as this, after the expenditure of thousands of hours, have received no compensation. It is only because defendants and their counsel know that the leading members of the plaintiffs' securities bar are actually prepared to, and will, force a resolution on the merits and go to trial that meaningful settlements in actions such as this can occur.

86.     We are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

87.     For example, there has been a recent trend towards dismissal of actions with prejudice at the pleading stage. Indeed, the most recent federal appellate reports are filled with opinions

- 24 -

affirming dismissals with prejudice in securities cases. *See, e.g., Darby v. Century Bus. Servs.*, 96 Fed. Appx. 277 (6th Cir. 2004) (dismissed with prejudice); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 571 (6th Cir. 2004) (dismissed with prejudice); *Miller v. Champion Enters., Inc.*, 346 F.3d 660 (6th Cir. 2003) (dismissed with prejudice); *Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002); *Romine v. Acxiom Corp.*, 296 F.3d 701 (8th Cir. 2002); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002); *DeMarco v. DepoTech Corp.*, 32 Fed. Appx. 260 (9th Cir. 2002); *Colin v. Onyx Acceptance Corp.*, 31 Fed. Appx. 359 (9th Cir. 2002); *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001); *Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001); *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001); *Berger v. Ludwick*, 15 Fed. Appx. 528 (9th Cir. 2001); *Theoharous v. Fong*, 256 F.3d 1219 (11th Cir. 2001); *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Yourish v. California Amplifier*, 191 F.3d 983 (9th Cir. 1999); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999).

88.    The many appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is no guaranty of recovery. *See In re U.S. West, Inc. Sec. Litig.*, 201 F. Supp. 2d 302 (D. Del. 2002), *aff'd*, 65 Fed. Appx. 856 (3d Cir. 2003); *In re Digi Int'l, Inc. Sec. Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *In re Silicon Graphics Sec. Litig.*, 183 F. 3d 970 (9th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Comshare Inc., Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998).

- 25 -

89.     Moreover, even plaintiffs who succeed at trial may find their judgment overturned on appeal. Milberg Weiss Bershad Hynes & Lerach LLP lost a large securities fraud class action in *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997), when the Court of Appeals reversed a jury verdict of $81 million after a 19-day trial in Jacksonville, Florida against an accounting firm on loss causation grounds and entered judgment for the defendant. Other such cases lost on or after trial include *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994) (directed verdict after plaintiffs' presentation of its case to the jury), *aff'd*, 50 F.3d 6 (4th Cir. 1995); *Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985) (summary judgment and jury verdict in favor of defendants in action challenging Marathon/U.S. Steel merger); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987) (directed verdict for defendants after five years of litigation; affirmed on appeal); *Krinsk v. Fund Asset Management, Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988) (verdict for defendants after trial), *aff'd*, 875 F.2d 404 (2d Cir. 1989). *See also Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).

90.     An example of how risky, and indeed difficult, this type of litigation is, also is exemplified by the history of *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990). In that case, after 11 years of litigation, a jury verdict in the plaintiffs' favor and a First Circuit decision sustaining plaintiffs' cause of action, plaintiffs' case was dismissed in an en banc decision and plaintiffs recovered nothing.

91.     Moreover, subsequent to the passage of the PSLRA, many cases in this Circuit have been dismissed (with or without prejudice) at the pleading stage in response to defendants' arguments that the complaints do not meet the PSLRA's heightened pleading standards. *See In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *In re Ford Motor Co. Sec. Litig.*, 184 F. Supp. 2d 626 (E.D. Mich. 2001); *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559 (E.D. Mich. 2001); *In re Lason, Inc. Sec. Litig.*, 143 F. Supp. 2d 855 (E.D. Mich. 2001); *In re Champion*

*Enters. Sec. Litig.*, 144 F. Supp. 2d 848 (E.D. Mich. 2001); *In re SCB Computer Tech., Inc.*, 149 F. Supp. 2d 334 (W.D. Tenn. 2001); *Brewer v. Lincoln Int'l Corp.*, 148 F. Supp. 2d 792 (W.D. Ky. 2000); *Booth v. Verity, Inc.*, 124 F. Supp. 2d 452 (W.D. Ky. 2000); *Weber v. Contempo Colours, Inc.*, 105 F. Supp. 2d 769 (W.D. Mich. 2000); *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662 (E.D. Mich. 1999).

92.    Losses such as those described above are exceedingly expensive. The fees that are awarded are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state and local authorities. Changes in the law through legislation or judicial decree can be catastrophic, frequently affecting all of contingent counsel's pending cases. These are real threats.

93.    Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement of the federal securities laws and state corporation laws can only occur if the private plaintiffs can obtain parity in representation with that available to large corporate interests. If this important public policy is to be carried out, the courts must award fees which will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

94.    When we undertook to act for the plaintiffs in this matter, we were aware that the only way we would be compensated was to achieve a successful result.

### 5.    Standing and Expertise of Plaintiffs' Counsel

95.    The expertise and experience of plaintiffs' counsel is described in the declarations of Lead Counsel and Liaison Counsel which are being concurrently filed herewith. Lead Counsel is among the most experienced and skilled practitioners in the securities litigation field.

### 6.   Standing and Caliber of Defendants' Counsel

96.   The quality of work performed by plaintiffs' counsel in attaining the settlement may also be evaluated, in part, in view of the quality of the opposition. Counsel for Defendants are highly skilled and experienced in defending actions such as these. Plaintiffs' counsel were thus confronted with formidable opposition in the prosecution of this Litigation.

97.   As the Court is aware, Defendants' counsel in this action vigorously contested plaintiffs' allegations. In the face of this formidable opposition, plaintiffs' counsel were able to develop their case sufficiently to press the Defendants into a settlement of this action on a basis favorable to the class.

### C.   Plaintiffs' Counsel Should be Reimbursed for the Expenses They Have Incurred

98.   The reimbursement of expenses to counsel who created a common fund is appropriate. Plaintiffs' counsel have incurred unreimbursed expenses in the amount of $250,040.65 for which they seek reimbursement. A breakdown of the aggregate expenses incurred by category is contained in the Declarations submitted herewith by Lead and Liaison Counsel.

99.   The Notice mailed to class members states that plaintiffs' counsel intended to apply for reimbursement of their expenses up to a maximum amount of $290,000. As with plaintiffs' fee request, not a single objection has been raised to this request.

100.   I have reviewed the expenses for which reimbursement is sought and in view of the complex nature of this Litigation, the expenses incurred by Lead and Liaison Counsel were reasonable in amount and necessarily incurred for the successful prosecution of the Litigation. Accordingly, plaintiffs' counsel should be reimbursed for their expenses incurred in connection with this Litigation.

## VIII.  CONCLUSION

101.    Plaintiffs respectfully request that the settlement of this Litigation, in the amount of $4,000,000 in cash, and that the Plan of Allocation to distribute the settlement be approved as fair, reasonable and adequate.  In addition, plaintiffs respectfully request that the Court approve plaintiffs' counsel's application for attorneys' fees and expenses in the amount of $1,250,040.65 representing 31.25% of the Settlement Fund.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 30th day of June, 2004, at San Diego, California.

_____
HELEN J. HODGES

S:\Settlement\AKSteel.Set\dec00005354.doc

## DECLARATION OF SERVICE BY FEDERAL EXPRESS DELIVERY

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 401 B Street, Suite 1700, San Diego, California 92101.

2.      That on July 1, 2004, declarant served by FedEx, next day delivery, the **DECLARATION OF HELEN J. HODGES IN SUPPORT OF THE PROPOSED SETTLEMENT, PLAN OF ALLOCATION AND APPLICATION OF PLAINTIFFS' COUNSEL FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES** to the parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of July, 2004, at San Diego, California.

DANELLE L. MCNERTNEY

AK STEEL (LEAD)
Service List - 6/30/2004    (200-139)
Page 1 of 1

**Counsel For Defendant(s)**

David C. Horn
Adam P. Hall
Frost Brown Todd LLC
201 E. Fifth Street, Suite 2200
Cincinnati, OH 45202-4182
    513/651-6800
    513/651-6981 (Fax)

Andrew J. Dorman
William J. Muniak
Janik & Dorman
9200 South Hills Blvd., Suite 300
Cleveland, OH 44147-3521
    440/838-7600
    440/838-7601 (Fax)

John A. Neuwirth
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119
    212/310-8000
    212/310-8007 (Fax)

**Counsel For Plaintiff(s)**

William S. Lerach
Helen J. Hodges
Tricia L. McCormick
Lerach Coughlin Stoia & Robbins LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297
    619/231-1058
    619/231-7423 (Fax)

Richard S. Wayne
William K. Flynn
Strauss & Troy
Federal Reserve Building
150 East Fourth Street
Cincinnati, OH 45202-4018
    513/621-2120
    513/629-9426 (Fax)